# 19-3953

IN THE

# United States Court of Appeals for the Second Circuit

AVON NURSING AND REHABILITATION,
BRIGHTONIAN NURSING AND REHABILITATION, WOODSIDE MANOR NURSING AND
REHABILITATION, THE SHORE WINDS NURSING AND REHABILITATION, THE
HURLBUT NURSING AND REHABILITATION, HORNELL GARDENS NURSING AND
REHABILITATION, CONESUS LAKE NURSING AND REHABILITATION, NEWARK MANOR
NURSING AND REHABILITATION, PENFIELD PLACE NURSING AND REHABILITATION,
HAMILTON MANOR, LATTA ROAD NURSING HOME EAST, LATTA ROAD NURSING
HOME WEST, SENECA NURSING AND REHABILITATION, ELDERWOOD AT AMHERST,
ELDERWOOD OF LAKESIDE AT BROCKPORT, ELDERWOOD AT CHEEKTOWAGA,
ELDERWOOD AT GRAND ISLAND, ELDERWOOD AT HAMBURG, ELDERWOOD OF
HORNELL, ELDERWOOD OF UIHLEIN AT LAKE PLACID, ELDERWOOD AT LANCASTER,
ELDERWOOD AT LIVERPOOL, ELDERWOOD AT LOCKPORT, ELDERWOOD AT NORTH
CREEK, ELDERWOOD AT WAVERLY, ELDERWOOD AT WHEATFIELD, ELDERWOOD AT
WILLIAMSVILLE, ELDERWOOD AT RIVERSIDE, ELDERWOOD OF SCALLOP SHELL AT
WAKEFIELD, WESTCHESTER CENTER FOR REHABILITATION AND NURSING,
HIGHFIELD GARDENS CARE CENTER OF GREAT NECK, SAN SIMEON BY THE SOUND,
DRY HARBOR NURSING HOME AND REHABILITATION CENTER,
*Plaintiffs-Appellants*,
*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF THE AMERICAN HEALTH CARE ASSOCIATION AS
AMICUS CURIAE SUPPORTING APPELLANTS SEEKING REVERSAL**

James F. Segroves
REED SMITH LLP
1301 K Street, NW
Suite 1000 - East Tower
Washington, DC 20005-3373
(202) 414-9200
jsegroves@reedsmith.com

NEW YORK CENTER FOR REHABILITATION AND NURSING,
*Plaintiff,*

*– v. –*

ALEX M. AZAR, II, SECRETARY OF THE UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
*Defendant-Appellee.*

## CORPORATE DISCLOSURE STATEMENT

The undersigned certifies that the American Health Care Association does not have any parent corporations. The foregoing not-for-profit organization does not issues shares of stock. Therefore, no publicly held corporation owns a 10-percent or greater interest in the foregoing organization.

_____s/James F. Segroves_____
James F. Segroves

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT...............................................i

TABLE OF AUTHORITIES..........................................................................iv

STATEMENT OF INTEREST OF AMICUS CURIAE ................................1

SUMMARY OF ARGUMENT.........................................................................4

ARGUMENT ....................................................................................................6

I. THE COURT SHOULD REJECT THE SECRETARY'S ATEXTUAL
JURISDICTIONAL ARGUMENT WITH RESPECT TO LEGAL
CLAIMS ARISING UNDER THE MEDICAID ACT .......................................6

II. THE 2017 FINAL RULE VIOLATES OBRA '87'S COMMAND
THAT ALL SURVEY TEAMS INCLUDE A REGISTERED NURSE ................9

    A. The 2017 Final Rule Fails Under *Chevron* Step One ...................10

        1. The Road to OBRA '87 and Its Aftermath ....................................11

            a. The *Smith* Litigation ................................................11

            b. The IoM Study........................................................12

            c. Pre-OBRA '87 Rulemaking.....................................14

            d. OBRA '87 ...............................................................15

            e. Post-OBRA '87 Rulemaking...................................21

        2. The 2017 Final Rule Contradicts the Congressional
Intent Behind OBRA '87 ................................................23

    B. Alternatively, the 2017 Final Rule Fails Under *Chevron* Step Two...........24

CONCLUSION ...............................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alameda Cnty. Med. Ctr. v. Leavitt,*
   559 F. Supp. 2d 1 (D.D.C. 2008) ..................................................................................24

*Cappetta v. Comm'r of Soc. Sec.,*
   904 F.3d 158 (2d Cir. 2018) ...........................................................................................11

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ............................................................................................... *passim*

*Colo. River Water Conservation Dist. v. United States,*
   424 U.S. 800 (1976) .........................................................................................................6

*Estate of Smith v. Heckler,*
   747 F.2d 583 (10th Cir. 1984) ................................................................................ 11, 12

*Good Fortune Shipping SA v. Comm'r,*
   897 F.3d 256 (D.C. Cir. 2018) .....................................................................................25

*Good Samaritan Hosp. v. Shalala,*
   508 U.S. 402 (1993) .........................................................................................................9

*Ill. Council on Long Term Care Inc. v. Shalala,*
   143 F.3d 1072 (7th Cir. 1998) ........................................................................................8

*Ill. Council on Long Term Care Inc. v. Shalala,*
   529 U.S. 1 (2000) ............................................................................................................8

*Ill. Council on Long Term Care Inc. v. Shalala,*
   No. 97-2315, 2000 WL 689693 (7th Cir. May 25, 2000) ...............................................8

*In re Greenwald,*
   48 B.R. 263 (S.D.N.Y. 1984).........................................................................................8

*In re Townview Nursing Home,*
   28 B.R. 431 (Bankr. S.D.N.Y. 1983).............................................................................8

*Mich. Ass'n of Homes & Services for the Aging, Inc. v. Shalala,*
   127 F.3d 496 (6th Cir. 1997).........................................................................................9

*Michigan v. EPA*,
135 S. Ct. 2699 (2015) ...................................................................25

*R.I. Hosp. v. Califano*,
585 F.2d 1153 (1st Cir. 1978) ..........................................................8

*Springdale Convalescent Ctr. v. Mathews*,
545 F.2d 943 (5th Cir. 1977) ............................................................8

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016) ......................................................................7

*Wei Sun v. Sessions*,
883 F.3d 23 (2d Cir. 2018) .............................................................10

## STATUTES

28 U.S.C. § 1331 ....................................................................................6

Administrative Procedure Act,
5 U.S.C. § 706 ....................................................................................9

Omnibus Reconciliation Act of 1987,
Pub. L. No. 100-203, 101 Stat. 1330 ....................................*passim*

§ 4202(a)(2), 101 Stat. at 1330-175 ..................................................1

§ 4204(a), 101 Stat. at 1330-182 ....................................................21

§ 4212(a)(2), 101 Stat. at 1330-207 ..................................................1

§ 4214(a), 101 Stat. at 1330-219 ....................................................21

Social Security Act § 205,
42 U.S.C. § 405 ..................................................................................7

Social Security Act § 205(h),
42 U.S.C. § 405(h) ................................................................3, 4, 7, 8

Social Security Act § 1819,
42 U.S.C. § 1395i-3 ......................................................................7, 16

Social Security Act § 1819(b)(4)(C)(i),
42 U.S.C. § 1395i-3(b)(4)(C)(i) ......................................................26

Social Security Act § 1819(g),
    42 U.S.C. § 1395i-3(g) ................................................................ 1, 4

Social Security Act § 1819(g)(2),
    42 U.S.C. § 1395i-3(g)(2) ...................................................... 25, 26

Social Security Act § 1819(g)(2)(E)(i),
    42 U.S.C. § 1395i-3(g)(2)(E)(i) ............................................... *passim*

Social Security Act § 1819(g)(2)(E)(ii),
    42 U.S.C. § 1395i-3(g)(2)(E)(ii) ....................................................25

Social Security Act § 1819(g)(3),
    42 U.S.C. § 1395i-3(g)(3) ..............................................................26

Social Security Act § 1819(g)(4),
    42 U.S.C. § 1395i-3(g)(4) .................................... 10, 20, 23, 25

Social Security Act § 1872,
    42 U.S.C. § 1395ii ............................................................ 3, 7, 8

Social Security Act § 1919,
    42 U.S.C. § 1396r ............................................................................7

Social Security Act § 1919(b)(4)(C)(i),
    42 U.S.C. § 1396r(b)(4)(C)(i) ......................................................26

Social Security Act § 1919(g),
    42 U.S.C. § 1396r(g) .............................................................. 1, 4

Social Security Act § 1919(g)(2),
    42 U.S.C. § 1396r(g)(2) ...................................................... 25, 26

Social Security Act § 1919(g)(2)(E)(i),
    42 U.S.C. § 1396r(g)(2)(E)(i) ................................................ *passim*

Social Security Act § 1919(g)(2)(E)(ii),
    42 U.S.C. § 1396r(g)(2)(E)(ii) ......................................................25

Social Security Act § 1919(g)(3),
    42 U.S.C. § 1396r(g)(3) ................................................................26

Social Security Act § 1919(g)(4),
    42 U.S.C. § 1396r(g)(4) ..................................... 10, 20, 23, 25

Social Security Amendments of 1965,
Pub. L. No. 89-97, 79 Stat. 286 .................................................................7

§ 102(a), 79 Stat. at 291 .............................................................................7

§ 121(a), 79 Stat. at 343 ......................................................................... 7, 8

## REGULATIONS

42 C.F.R. § 488.2 .........................................................................................6

42 C.F.R. § 488.300 .....................................................................................7

42 C.F.R. § 488.308(e)(2) (2016) ...........................................................22

## RULES

Medicare and Medicaid Programs Long-Term Care Survey,
51 Fed. Reg. 21,550 (June 13, 1986) ............................................... 14, 15

Proposed Rule, Long Term Care Survey,
52 Fed. Reg. 24,752 (July 1, 1987) ....................................................15

Proposed Rule, Survey and Certification of Health Care Facilities,
52 Fed. Reg. 44,300 (Nov. 18, 1987) ......................... 12, 17, 18, 23

Proposed Rule, Survey, Certification and Enforcement of Skilled
Nursing Facilities and Nursing Facilities, 57 Fed. Reg. 39,278
(Aug. 28, 1992) ...................................................................21, 22, 23

Statement of Organization, Functions and Delegations of Authority,
66 Fed. Reg. 35,437 (July 5, 2001) .....................................................12

Survey Team Composition,
82 Fed. Reg. 36,530 (Aug. 4, 2017)............................................*passim*

## OTHER AUTHORITIES

Gov't Accountability Office, *Nursing Homes: More Reliable Data and Consistent
Guidance Would Improve CMS Oversight of State Complaint Investigations*,
Rep. No. GAO-11-280 (Apr. 2011) ...................................................27

H.R. 3545, 100th Cong. (Dec. 11, 1987).......................................... 18, 19

H.R. 3545, 100th Cong. (Dec. 21, 1987) ............................................................20

H.R. 3545, 100th Cong. (Oct. 29, 1987) ..............................................15, 16, 17

H.R. Rep. No. 100-391 (1987) .............................................................................15

H.R. Rep. No. 100-495 (1987) (Conf. Rep.) ......................................................19

Inst. of Med., *Improving the Quality of Care in Nursing Homes* (Mar. 1986) ..... 12, 13, 14, 24

## STATEMENT OF INTEREST OF AMICUS CURIAE

The American Health Care Association (AHCA) serves as the national representative of more than 13,500 facilities dedicated to improving the lives of more than 1.5 million Americans who live in Medicare-participating skilled nursing facilities (SNFs), Medicaid-participating nursing facilities (NFs), assisted living communities, and other settings throughout the United States. One way in which AHCA promotes the interests of its members is by participating as an amicus curiae in cases with important and far-ranging consequences for its members—including cases such as this one presenting important legal questions related to the survey process administered by the Centers for Medicare & Medicaid Services (CMS) under the statutory framework established by the Omnibus Reconciliation Act of 1987 (OBRA '87), Pub. L. No. 100-203, §§ 4202(a)(2), 4212(a), 101 Stat. 1330, 1330-175, 1330-207 (codified as amended at 42 U.S.C. §§ 1395i-3(g), 1396r(g)).[1]

AHCA has a substantial interest in ensuring that the survey process satisfies the statutory requirements imposed by OBRA '87. When done properly, the survey process helps ensure quality of care for residents of SNFs/NFs through the careful, even-handed application of clinical expertise and regulatory knowledge. However,

---

[1] The undersigned certifies that the parties have consented to the filing of this brief, no counsel for a party authored this brief in whole or in part, no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief, and no person or entity other than AHCA made a monetary contribution to its preparation or submission.

when done improperly, the survey process results in arbitrary punishment of SNFs/NFs through, among other things, the imposition of hundreds of thousands of dollars in civil monetary penalties that drain facility resources and make it more difficult to deliver high-quality care.

This case arises from regulatory amendments promulgated by CMS, which is an operating component within the Department of Health and Human Services. *See* Survey Team Composition, 82 Fed. Reg. 36,530, 36,635–36 (Aug. 4, 2017) (codified in scattered sections of 42 C.F.R.) (2017 Final Rule). The 2017 Final Rule purported to "clarify" that survey teams performing so-called "complaint surveys"—surveys of SNFs/NFs that are conducted on the basis of a substantial allegation of noncompliance with the requirements for participation in Medicare and Medicaid—do *not* have to include a registered nurse. *Id.* at 36,625. This purported clarification did not go unchallenged during the notice-and-comment process. AHCA responded to CMS's proposed rule by submitting a comment letter challenging the legality of the proposed changes and repeatedly asserting that the changes violated the plain language of OBRA '87. *See* AHCA Comment Letter at 8, 51, 153 (June 22, 2017).[2]

Plaintiffs-Appellants Avon Nursing and Rehabilitation, *et al.* (collectively, the "Plaintiff-Facilities") subsequently filed this action in the United States District Court for the Southern District of New York challenging the legality of the 2017 Final Rule.

---

[2] *Available at* https://www.regulations.gov/document?D=CMS-2017-0060-0095 (last visited Feb. 21, 2020).

Defendant Secretary of Health and Human Services (the Secretary) responded by challenging the district court's subject-matter jurisdiction under the auspices of 42 U.S.C. § 405(h), as incorporated by the Medicare Act, 42 U.S.C. § 1395ii. In essence, the Secretary argued that all of the Plaintiff-Facilities' legal claims arise under the Medicare Act, thereby requiring presentment to the Secretary and exhaustion of administrative remedies prior to judicial review. The Plaintiff-Facilities, in turn, challenged the Secretary's assertion and argued that certain of their legal claims arise under the *Medicaid* Act, which does *not* contain a wholesale incorporation of § 405(h). The parties also submitted detailed briefing on the substantive validity of the 2017 Final Rule, and AHCA was granted leave to participate as an amicus in the district court.

The district court (Laura Taylor Swain, J.) eventually agreed with the Secretary's jurisdictional argument and dismissed the case without reaching the substantive validity of the 2017 Final Rule. The Plaintiff-Facilities have appealed that ruling. Therefore, in its current posture, this appeal presents two legal questions of significant importance to AHCA and its members: one jurisdictional (and on which there is conflicting case law), the other substantive (and of first impression) as it relates to the legality of the 2017 Final Rule.

## SUMMARY OF ARGUMENT

1.     The Court should reject the Secretary's atextual jurisdictional argument with respect to the Plaintiff-Facilities' legal claims arising under the Medicaid Act. The simple fact is that Congress could have, but did not, incorporate the jurisdictional limitations of § 405(h) for purposes of the Medicaid Act. For example, in the 1965 legislation that created both the Medicare Act and the Medicaid Act, Congress chose to incorporate § 405(h) for purposes of the Medicare Act only. Ample persuasive authority supports the plain-language construction that § 405(h) cannot deprive a district court of jurisdiction to resolve legal claims arising under the Medicaid Act.

2.     The Secretary's substantive defense of the 2017 Final Rule lacks merit regardless of which of the two analytical steps this Court applies under the framework established by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

a.     The 2017 Final Rule is invalid under *Chevron* step one, which asks whether Congress has spoken to the precise question at issue. The 2017 Final Rule essentially represents a return to the *laissez-faire*, cost-saving attitude toward surveys that led Congress to enact OBRA '87 in the first place. It is an attitude precluded by the plain language and history of OBRA '87. In enacting that groundbreaking statute, Congress specified that *all* surveys conducted under subsection (g) of Social Security Act §§ 1819 and 1919, 42 U.S.C. §§ 1395i-3 and 1396r, "shall be conducted by a multidisciplinary team of professionals (*including a registered professional nurse*)." (Empha-

- 4 -

sis added.) A complaint survey is a survey conducted under subsection (g)—specifically, paragraph (g)(4). Therefore, the 2017 Final Rule contradicts the plain language and history of OBRA '87 by asserting that States have discretion whether to include a registered nurse on a complaint survey team.

   b.   Alternatively, the 2017 Final Rule fails under *Chevron* step two, which asks whether the agency's statutory interpretation is reasonable if Congress has not spoken to the precise question at issue. The Secretary's statutory interpretation leads to absurd results. Included among them would be the non-applicability of OBRA '87's stringent conflict-of-interest requirements for members of survey teams. Under the Secretary's interpretation of OBRA '87, a complaint survey could be conducted by the owner of the facility under review or an employee of that facility. Moreover, the Secretary's statutory interpretation would exempt from the registered-nurse requirement surveys performed by the Secretary that are designed to validate the performance of surveys conducted by States. That is clearly not what Congress intended when it enacted OBRA '87, the sole motivating factor of which was to ensure quality of care provided to residents of SNFs/NFs. Requiring the Secretary and the States to comply with the registered-nurse requirement for survey teams does just that while also ensuring that the quality of care is judged by individuals who have the professional qualifications and experience to do so.

# ARGUMENT

## I.   THE COURT SHOULD REJECT THE SECRETARY'S ATEXTUAL JURISDIC-TIONAL ARGUMENT WITH RESPECT TO LEGAL CLAIMS ARISING UNDER THE MEDICAID ACT

Federal courts have a "virtually unflagging obligation" to "exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). As is relevant here, Congress has instructed that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Medicaid Act is clearly a law of the United States within the meaning of § 1331, and the Plaintiff-Facilities expressly invoked § 1331 in challenging the 2017 Final Rule as being in excess of the Secretary's statutory authority under the Medicaid Act. *See* 2 JA 284 (2d Am. Compl. ¶ 46).[3]

The Secretary does not claim otherwise, nor does he deny the fact that the regulations governing the survey process are contained in a part of the Code of Federal Regulations promulgated by authority of the Medicaid Act. *See* 42 C.F.R. § 488.2 (explaining that statutory basis of part 488 includes Social Security Act § 1919, 42

---

[3] The statutory nomenclature in this area can be somewhat confusing. By way of background, Medicare and Medicaid are creatures of separate titles of the Social Security Act (titles XVIII and XIX, respectively), which titles are often referred to as the "Medicare Act" and the "Medicaid Act," respectively. The Social Security Act has been codified in title 42 of the United States Code. However, because title 42 of the United States Code has not been enacted into positive law, Congress, the Secretary, and CMS typically refer to Medicare and Medicaid statutory provisions by citing those provisions as they appear in the Social Security Act, not the United States Code. Where appropriate, this brief endeavors to cite both the Social Security Act and its accompanying codification in the United States Code.

U.S.C. § 1396r); *see also* 42 C.F.R. § 488.300 ("Sections 1819 *and 1919* of the [Social Security] Act establish requirements for surveying SNFs and NFs to determine whether they meet the requirements for participation in the Medicare *and Medicaid* programs.") (emphasis added). Instead, the Secretary essentially argues that because of the substantial similarities between the text of Social Security Act §§ 1819 and 1919, 42 U.S.C. §§ 1395i-3 and 1396r, this Court should as a matter of public policy apply § 405(h) to legal claims arising under the Medicaid Act.

"[P]olicy arguments," the Supreme Court of the United States recently reaffirmed, "cannot supersede the clear statutory text." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). Unlike the Medicare Act, which specifically incorporates § 405(h) by reference via 42 U.S.C. § 1395ii, no statute applies § 405(h) to all legal claims arising under the Medicaid Act. Congress easily could have done so. For example, in 1965, Congress created the Medicare Act in the same piece of legislation that created the Medicaid Act. *Compare* Social Security Amendments of 1965, Pub. L. No. 89-97, § 102(a), 79 Stat. 286, 291 (adding title XVIII to the Social Security Act), *with id.* § 121(a), 79 Stat. at 343 (adding title XIX to the Social Security Act). The 1965 Congress made a conscious decision to incorporate § 405(h) for purposes of claims arising under the Medicare Act. *See id.* § 102(a), 79 Stat. at 332 (creating Social Security Act § 1872, 42 U.S.C. § 1395ii, stating that the "provisions . . . of subsections (a), (d), (e), (f), *(h),* (i), (j), (k), and (*l*) of section 205 [of the Social Security Act, 42 U.S.C. § 405], shall also apply with respect to this title to

the same extent as they are applicable with respect to title II [of the Social Security Act]") (emphasis added). Congress included no such provision when it created the Medicaid Act, *see* Social Security Amendments of 1965 § 121(a), 79 Stat. at 343–52, nor has Congress enacted any such provision in the more than half a century since it created the Medicaid Act.

Therefore, the Court should reject the argument that § 405(h) applies to legal claims arising under the Medicaid Act. *See In re Greenwald*, 48 B.R. 263, 272–73 (S.D.N.Y. 1984) ("Importantly, Medicaid, unlike Medicare, 42 U.S.C. § 1395ii, contains no administrative exhaustion prerequisite restricting judicial review for claims arising under the [Medicaid] Act."); *see also In re Townview Nursing Home*, 28 B.R. 431, 440 (Bankr. S.D.N.Y. 1983) (rejecting argument that § 405(h) applies to legal claims arising under the Medicaid Act); *accord Ill. Council on Long Term Care Inc. v. Shalala*, 143 F.3d 1072, 1076–77 (7th Cir. 1998) (finding § 405(h)'s jurisdictional limitation did not apply to pre-enforcement challenge to the extent it challenged regulations promulgated under the Medicaid Act), *rev'd in part on other grounds*, 529 U.S. 1 (2000), *appeal following remand*, No. 97-2315, 2000 WL 689693, at *1 (7th Cir. May 25, 2000) ("The Medicaid-related claims . . . were not before the Supreme Court, and our disposition of those claims therefore is unaffected."); *R.I. Hosp. v. Califano*, 585 F.2d 1153, 1161–63 (1st Cir. 1978) (finding § 405(h) "presents no jurisdictional bar in cases arising under" the Medicaid Act); *Springdale Convalescent Ctr. v. Mathews*, 545 F.2d 943, 949 (5th Cir. 1977) (recognizing that "Congress by not incorporating 42 U.S.C. § 405(h) into

the Medicaid Act has refused to insulate the Secretary's exercise of statutory authority under that Act from judicial review"), *abrogated in part on other grounds by Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993).[4]

## II. THE 2017 FINAL RULE VIOLATES OBRA '87'S COMMAND THAT ALL SURVEY TEAMS INCLUDE A REGISTERED NURSE

In relevant part, the Administrative Procedure Act provides that a "reviewing court shall . . . hold unlawful and set aside agency action found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Chevron*, 467 U.S. at 842. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n.9. If the statute "remains ambiguous despite [a court's] use of all relevant tools of statutory construction and legislative history, [a

---

[4] The principal decision on which the district court relied in reaching a contrary conclusion—*Michigan Ass'n of Homes & Services for the Aging, Inc. v. Shalala*, 127 F.3d 496 (6th Cir. 1997)—does not support a contrary result. For example, as the Plaintiff-Facilities' opening brief explains (at 45–46), the Sixth Circuit relied on an interpretation of Seventh Circuit case law that was subsequently rejected by the Seventh Circuit itself.

court] proceed[s] to a second step of analysis to examine whether the agency's interpretation is reasonable, and not arbitrary, capricious, or manifestly contrary to the statute." *Wei Sun v. Sessions*, 883 F.3d 23, 29 (2d Cir. 2018) (internal quotation marks and citation omitted).

As set forth in section II.A, below, the 2017 Final Rule fails under a *Chevron* step-one analysis. Alternatively, as set forth in section II.B, below, the same result would obtain even if the Court were to evaluate the 2017 Final Rule under *Chevron* step two.

## A.     The 2017 Final Rule Fails Under *Chevron* Step One

The Plaintiff-Facilities explain in detail why the statutory language at the heart of this case—"[s]urveys under this subsection shall be conducted by a multidisciplinary team of professionals (including a registered professional nurse)," Social Security Act §§ 1819(g)(2)(E)(i) and 1919(g)(2)(E)(i), 42 U.S.C. §§ 1395i-3(g)(2)(E)(i) and 1396r(g)(2)(E)(i)—unambiguously means what it says: namely, that *any* survey conducted under subsection (g), which would include a complaint survey conducted under paragraph (g)(4), must be conducted by a survey team that includes at least one registered nurse. *See* Blue Br. at 50–56. Rather than burden the Court by repeating the Plaintiff-Facilities' arguments, AHCA wishes to supplement those arguments by demonstrating that the history surrounding OBRA '87 also supports the Plaintiff-Facilities' plain-language construction. *See Cappetta v. Comm'r of Soc. Sec.*, 904 F.3d 158,

168 n.6 (2d Cir. 2018) (supplementing analysis of statute's language with relevant legislative history at *Chevron* step one).

### 1. The Road to OBRA '87 and Its Aftermath

One cannot fully appreciate the statutory changes enacted by Congress in OBRA '87 without understanding the historical context in which those changes were adopted. As is relevant here, that historical context included lengthy litigation that ultimately required the Secretary to make changes in the manner in which the Secretary surveyed Medicaid-participating facilities, the Secretary's failed rulemaking efforts to satisfy orders entered by the district court in that litigation, a detailed study performed at the behest of the Secretary by the National Academy of Sciences' Institute of Medicine ("IoM"), and Congress's statutory embrace of IoM's recommendations and application of them to both the Medicare and Medicaid programs.

### a. The *Smith* Litigation

In 1975, a class action was filed in the United States District Court for the District of Colorado against state and federal officials challenging, among other things, the Secretary's process for ensuring that quality care was provided in Medicaid-participating facilities. *See Estate of Smith v. Heckler*, 747 F.2d 583, 585 (10th Cir. 1984). In 1984, the United States Court of Appeals for the Tenth Circuit held that the Secretary

> has a duty to establish a system to adequately inform herself as to whether the facilities receiving federal money are satisfying the requirements of the [Medicaid] Act. These requirements include providing high

quality patient care. This duty to be adequately informed is not only a duty to be informed at the time a facility is originally certified, but is a duty of continued supervision.

*Id.* at 589. The Tenth Circuit remanded the case to the district court to oversee the Secretary's efforts to satisfy the above statutory duty. *Id.* at 591–92.

### b. The IoM Study

Meanwhile, in 1983, CMS—then known as the Health Care Financing Administration ("HCFA")[5]—contracted with IoM to conduct an extensive study of the regulation of nursing homes. *See* Proposed Rule, Survey and Certification of Health Care Facilities, 52 Fed. Reg. 44,300, 44,300 (Nov. 18, 1987) ("November 1987 Proposed Rule"). IoM eventually published its lengthy study in early 1986. *See* Inst. of Med., *Improving the Quality of Care in Nursing Homes* (Mar. 1986) ("IoM Study").[6]

The IoM Study made two recommendations of particular relevance here.

First, IoM found that "[t]he survey process should be coordinated with the complaint-handling process, and the latter would be strengthened." IoM Study at 34. Therefore, in "Recommendation 4-8," IoM concluded that HCFA "should require states to have a specific procedure and sufficient staff to properly investigate complaints." *Id.* (emphasis omitted). As IoM explained:

---

[5] *See* Statement of Organization, Functions and Delegations of Authority, 66 Fed. Reg. 35,437 (July 5, 2001) (noting agency's name change). This brief uses "HCFA" when referring to events that occurred when the agency was commonly known by that acronym.

[6] *Available* at http://nap.edu/646 (last visited Feb. 21, 2020).

Although complaints can be an important source of information about substandard conditions and form the basis for potential enforcement actions, federal guidelines about complaint handling are general (State Operations Manual, Section 3500), and sufficient staff for adequate complaint handling is not always available to state licensure and certification agencies. Each state agency has its own way of handling complaints. The committee's survey found that 46 (of 47) state agencies conduct complaint investigations. Forty-one reported that their state had a statutory complaint and abuse reporting system, 34 operated by the survey agency and 7 by another agency. Of the survey agencies, 10 had separately staffed complaint units; the others used regular surveyors.

Complaints are a potentially important source of information about compliance between annual certification inspection visits. There should be HCFA guidelines for analyzing and reporting complaints. The complaint procedure should include criteria for deciding whether to conduct an investigation, whether to conduct an onsite visit, how to schedule follow[-]up visits, and when to cite deficiencies. Complaint histories might also be used to decide whether to initiate an earlier survey or go directly to an extended survey or both.

*Id.* at 124–25.

Second, in "Recommendation 4-16," IoM addressed the qualifications of surveyors, explaining:

Federal regulations and the State Operations Manual are very general regarding survey agency staffing levels and qualifications. In practice, there are significant variations in the experience and educational backgrounds of the surveyors and the composition of the survey teams in each state, for example, how many nurses, generalists or sanitarians, and other specialists such as pharmacists, nutritionists, physicians are on the teams. Nationally, about half are nurses, a fifth are sanitarians, and most of the rest are engineers, administrators, and generalists.[]

Surveyors come from a variety of backgrounds, and few have previous nursing home or long-term-care experience.

Federal guidelines for survey staff composition permit states a great deal of latitude, and the HCFA's data on surveyors indicate that

some states are not staffed adequately to conduct surveys that are more oriented to resident care. <u>For example, at least one state had no nurses on its survey staff in 1982.</u>[] <u>In 1983, eight states had only one or two licensed nurses on staff.</u>[]

> *Recommendation 4-16: The HCFA should revise its guidelines to make them more specific about the qualifications of surveyors and the composition and numbers of survey team staff necessary to conduct adequate resident-centered, outcome-oriented inspections of nursing homes.* <u>*At a minimum, every survey team should include at least one nurse.*</u> *For use on extended surveys, the survey agency should have specialists on staff (or, in small states, as consultants) in the disciplinary areas covered by the conditions and standards (for example, pharmacy, nutrition, social services, and activities).*

*Id.* at 136 (underlined emphasis added) (footnotes omitted).

### c.     **Pre-OBRA '87 Rulemaking**

Three months after the IoM Study was released, HCFA published a final rule in response to an order entered by the district court in *Smith* following remand from the Tenth Circuit. *See* Medicare and Medicaid Programs Long-Term Care Survey, 51 Fed. Reg. 21,550 (June 13, 1986) ("1986 Final Rule"). The 1986 Final Rule noted that comments received by the agency "recommended various compositions for the survey team. The most common suggestion was that a team consist of at least three health professionals, *including at least one registered nurse.*" *Id.* at 21,555 (emphasis added). However, HCFA rejected that suggestion, explaining that "[s]urvey team size and composition *are decided by the States* as established in our agreements with States to conduct surveys . . . ." *Id.* (emphasis added). While "guidelines" contained in another study commissioned by HCFA "recommend[ed]" that all survey teams be led by a registered nurse, HCFA declined to impose such a requirement. *Id.*

- 14 -

Approximately one year later, and in response to a subsequent order by the district court in *Smith* finding that the 1986 Final Rule was invalid, HCFA published another proposed rule addressing the survey process. *See* Proposed Rule, Long Term Care Survey, 52 Fed. Reg. 24,752 (July 1, 1987) ("July 1987 Proposed Rule"). The July 1987 Proposed Rule once again refused to impose a requirement that survey teams include at least one registered nurse. Instead, HCFA stated that "[w]henever possible," a survey team *should* include "at least one [registered nurse] plus another [registered nurse] or a dietician or a pharmacist." *Id.* at 24,818.

### d.    OBRA '87

With the recommendations of the IoM Study in hand, in October 1987, the House of Representatives began considering the legislative vehicle that would eventually become OBRA '87: House Bill 3545. *See* H.R. 3545, 100th Cong. (Oct. 29, 1987), *reprinted in* 133 Cong. Rec. 29,966 (1987); *see also* H.R. Rep. No. 100-391, pt. 1, at 452 (1987) (describing IoM Study's recommendations), *reprinted in* 1987 U.S.C.C.A.N. 2313-1, 2313-272. Reflecting the fact that different House committees have jurisdiction over Medicare and Medicaid—the House Ways and Means Committee has jurisdiction over Medicare, while the House Energy and Commerce Committee has jurisdiction over Medicaid—each of those respective committees was responsible for drafting separate titles of House Bill 3545. *See* H.R. 3545 § 2 (bill's table of contents indicating different committee responsibilities for various titles),

*reprinted in* 133 Cong. Rec. at 29,966. And each committee's approach differed on the question of survey-team composition.

The portion of House Bill 3545 having to do with the Medicare survey process was originally located in § 9312 of House Bill 3454. *See* 133 Cong. Rec. at 30,092–94. In relevant part, § 9312(b) of the bill would have added a new subsection (e) to Social Security Act § 1819. *See id.* at 30,093. Included within the new subsection (e) was subparagraph (2)(F), stating:

> (F)   SURVEY TEAMS.—
>
> (i) IN GENERAL.—Surveys under this subsection shall be conduct-ed by a multidisciplinary team of professionals (including a registered professional nurse and others selected in accordance with regulations of the Secretary).
>
> (ii) SPECIALIZED TEAMS.—Each State shall maintain and utilize a specialized team for the purpose of identifying, surveying, gathering and preserving evidence, and carrying out appropriate enforcement actions against chronically substandard skilled nursing facilities. Such a team shall include (or have prompt access to) an attorney, an auditor, and ap-propriate health care professionals.

H.R. 3545 § 9312(b) (Oct. 29, 1987) (adding Social Security Act § 1819(e)(2)(F)), *reprinted in* 133 Cong. Rec. at 30,093 (quotation marks omitted). The Medicare portion of the bill also required States to maintain adequate staff to investigate complaints. *Id.* § 9312(b) (adding Social Security Act § 1819(e)(4)), *reprinted in* 133 Cong. Rec. at 30,093. All of the foregoing language was later moved to § 9212(b) of the bill. *See* 133 Cong. Rec. at 30,225 (noting amendment deleting subtitle that had immediately

- 16 -

preceded the subtitle containing the above provision and redesignating subtitles accordingly).

Meanwhile, the portion of House Bill 3545 having to do with the *Medicaid* survey process—which was authored by the House Energy and Commerce Committee—did not impose any specific requirements on the composition of survey teams. *See* H.R. 3545 § 4113(a) (Oct. 29, 1987) (adding Social Security Act § 1922(i)), *reprinted in* 133 Cong. Rec. at 30,028–29. Instead, States would only be required to have survey teams that met whatever qualification requirements were set by the Secretary. *See id.* § 4113(a) (adding Social Security Act § 1922(i)(2)(C)(ii)), *reprinted in* 133 Cong. Rec. at 30,029. And while States would be required to maintain "adequate staff" to investigate complaints, the Medicaid portion of House Bill 3545 was silent on what, if any, qualifications such staff would have to possess. *Id.* § 4113(a) (adding Social Security Act § 1922(i)(4)), *reprinted in* 133 Cong. Rec. at 30,029.

The House passed the bill by a one-vote margin on October 29, 1987. 133 Cong. Rec. at 30,238. The following month, HCFA published yet another proposed rule addressing the survey process, this time focused on the recommendations of the IoM Study. *See* November 1987 Proposed Rule, 52 Fed. Reg. 44,300. On the topic of "Staffing of Surveys," the November 1987 Proposed Rule stated that "IoM recommended that HCFA should have the authority to specify the minimum composition of State survey teams." *Id.* at 44,303. However, HCFA rejected that recommendation as being both unnecessary and beyond the agency's statutory authority, stating: "Since

- 17 -

data indicate that nurses are full participants in almost all surveys, we have asked for new legislative authority to deal with this issue *only when there is evidence that a problem exists in a particular State.* Since change in this area requires legislation, these regulations cannot address this issue further." *Id.* (emphasis added).

Congress addressed this issue further by passing OBRA '87 the following month after additional back and forth between the Senate and House. Specifically, on December 11, 1987, the Senate passed its amended version of House Bill 3545, which struck out all but the enacting clause and inserted a substitute. 133 Cong. Rec. at 35,333.

Section 4051(c)(4) of the Senate version of the bill added new certification-related subsections to Social Security Act § 1864 and applied them to Medicare- and Medicaid-participating facilities. *Id.* at 35,360–61. A new subsection (d) would have required States to conduct standard surveys of facilities on a roughly annual basis in order to certify whether the facilities complied with federal requirements. *See id.* § 4051(c)(4) (adding Social Security Act § 1864(d)), *reprinted in* 133 Cong. Rec. at 35,360. Importantly, the Senate version of the bill then added a new subsection (e), stating:

> (e)(1)(A) Not later than January 1, 1990, *certification surveys under subsection (d)* shall be conducted by a multidisciplinary team of professionals (including a registered professional nurse and others selected in accordance with regulations of the Secretary).
>
> (B) Each State *shall* maintain and utilize a specialized survey team the duties of which shall include identifying, surveying, gathering and

preserving evidence, and carrying out appropriate enforcement actions against chronically substandard facilities. Such a team *shall* include (or have prompt access to) an attorney, an auditor, and appropriate health care professionals. . . .

H.R. 3545 § 4051(c)(4) (Dec. 11, 1987) (adding Social Security Act § 1864(e)(1)), *reprinted in* 133 Cong. Rec. at 35,360 (emphasis added) (quotation marks and italics omitted). Therefore, unlike the initial House-passed version of the bill, the Senate version of the bill limited the registered-nurse requirement to "certification surveys under subsection (d)."

The House and Senate both insisted on their respective versions of the bill and appointed conferees. *See* 133 Cong. Rec. at 35,049–50, 35,108–09. The Conference Committee submitted its report a few days later. *See* H.R. Rep. No. 100-495 (1987) (Conf. Rep.), *reprinted in* 1987 U.S.C.C.A.N. 2313-1248. The Conference Committee report noted that existing federal law did not impose any requirements on the composition of survey teams. *Id.* at 707, *reprinted in* 1987 U.S.C.C.A.N. at 2313-1453. However, after describing the House and Senate versions of the bill, the Conference Committee report explained that the House provisions had been adopted with certain amendments. *Id.* at 715, *reprinted in* 1987 U.S.C.C.A.N. at 2313-1461.

The final version of the bill agreed to by the Conference Committee did three things of relevance here.

First, the Conference Committee adopted the broader "[s]urveys under this subsection" language found in the original Medicare portion of House Bill 3545

drafted by the House Ways and Means Committee. *See* H.R. 3545, 100th Cong. § 4202(a)(2) (Dec. 21, 1987) (adding Social Security Act § 1819(g)(2)(E)(i)), *reprinted in* 133 Cong. Rec. at 36,816.

Second, the Conference Committee added identical "[s]urveys under this sub-section" language to the Medicaid Act, thereby ensuring that the same registered-nurse requirement would also apply under that separate, independent statutory scheme. *See id.* § 4212(a) (adding Social Security Act § 1919(g)(2)(E)(i)), *reprinted in* 133 Cong. Rec. at 36,825.

Third, the Conference Committee adopted modified—and permissively word-ed—language regarding the use of specialized teams, adding the following identical sentence to both the Medicare Act and the Medicaid Act: "A State *may* maintain and utilize a specialized team (including an attorney, an auditor, and appropriate health care professionals) for the purpose of identifying, surveying, gathering and preserving evidence, and carrying out appropriate enforcement actions against chronically substandard" SNFs in the Medicare Act context and NFs in the Medicaid Act context. *Id.* §§ 4202(a)(2) (adding Social Security Act § 1819(g)(4)), 4212(a) (adding Social Security Act § 1919(g)(4)), *reprinted in* 133 Cong. Rec. at 36,816, 36,825 (emphasis added).

The Conference Committee version of House Bill 3545 was adopted by both Houses and became law on December 22, 1987. 101 Stat. at 1330.

### e.     Post-OBRA '87 Rulemaking

OBRA '87 instructed that the new survey process would go into effect on October 1, 1990, "without regard to whether regulations to implement such amendments are promulgated by such date." OBRA '87 §§ 4204(a), 4214(a), 101 Stat. at 1330-182, 1330-219. The Secretary did not propose regulations to implement the new survey process until 1992. *See* Proposed Rule, Survey, Certification and Enforcement of Skilled Nursing Facilities and Nursing Facilities, 57 Fed. Reg. 39,278 (Aug. 28, 1992). And it was not until 1994 that the Secretary finalized those regulations. *See* Survey, Certification and Enforcement of Skilled Nursing Facilities and Nursing Facilities, 59 Fed. Reg. 56,116 (Nov. 10, 1994) ("1994 Final Rule").

In relevant part, the 1994 Final Rule explained:

> Sections 1819(g)(2) and (3) and 1919(g)(2) and (3) of the [Social Security] Act, as added by sections 4202 and 4212 of OBRA '87 specify the requirements for types and periodicity of surveys that are to be conducted for each facility; including standard, special, partial extended, extended, and validation surveys. These provisions include specific contents and procedures, frequency, consistency, and team composition, and are intended to protect residents' rights, health and safety and not unduly burden the facilities or the survey agencies. . . .

>       . . .

> Sections 1819(g)(2)(A)(iii) and 1919(g)(2)(A)(iii) of the [Social Security] Act, as added by OBRA '87 specify that a standard survey or an abbreviated standard survey may be conducted within 2 months of any change of ownership, administration, management of a facility or director of nursing to determine whether the change has resulted in any decline in the quality of care furnished by the facility. *A survey conducted for the purpose of investigating a complaint against a facility is also considered a special survey.*

1994 Final Rule, 59 Fed. Reg. at 56,118 (emphasis added).

The 1994 Final Rule confirmed the importance of the italicized sentence above by codifying its content in the regulatory definition of a "special survey," which stated:

> (e)  *Special surveys.*
>
> . . .
>
> (2)  The survey agency must review all complaint allegations and conduct a standard or an abbreviated standard survey to investigate complaints of violations of requirements by SNFs and NFs if its review of the allegation concludes that—
>
>> (i)  A deficiency in one or more of the requirements may have occurred; and
>>
>> (ii)  Only a survey can determine whether a deficiency or deficiencies exist. . . . .

*Id.* at 56,239 (codified at 42 C.F.R. § 488.308(e)(2) (2016)). In doing so, the preamble to the 1994 Final Rule confirmed that not every complaint would necessitate a survey, explaining:

> We do not believe that it would be reasonable or economically feasible to require States, especially those with remotely located facilities, to survey all facilities for which complaints are received. The experience of State survey agencies has shown that many complaints are either groundless or are not potential violations of requirements for certification. This position, however, does not relieve the States from their responsibilities to properly evaluate and investigate all complaints that may affect a facility's certification.

*Id.* at 56,159.

Moreover, the 1994 Final Rule recognized the wisdom of Congress's policy decision to require a registered nurse on survey teams. "The registered nurse member of

the team is necessary," HCFA explained, "because SNFs and NFs are primarily engaged in providing skilled nursing care and/or related services." *Id.* at 56,142.

> **2.** **The 2017 Final Rule Contradicts the Congressional Intent Behind OBRA '87**

The month before Congress enacted OBRA '87, HCFA publicly rejected IoM's recommendation that all survey teams be required to include at least one registered nurse. *See* November 1987 Proposed Rule, 52 Fed. Reg. at 44,303. According to HCFA, IoM's recommendation was both unnecessary and beyond HCFA's statutory authority. *Id.* Congress then settled the question the following month with OBRA '87's enactment of clause (g)(2)(E)(i), instructing that "[s]urveys under this subsection *shall* be conducted by a multidisciplinary team of professionals (*including a registered professional nurse*)." (Emphasis added.) And in first implementing OBRA '87's statutory scheme governing the survey process, HCFA acknowledged this understanding of the registered-nurse requirement when the agency promulgated its definition of "special survey." *See* 1994 Final Rule, 59 Fed. Reg. at 56,118, 56,239.

Thirty years after OBRA '87's enactment, however, the 2017 Final Rule contorts the permissive language of paragraph (g)(4)—which provides that a State "*may* maintain and utilize a specialized team (including an attorney, an auditor, *and appropriate health care professionals*) for the purpose of identifying, *surveying*, gathering and preserving evidence, and carrying out appropriate enforcement actions" (emphasis added)—and uses it as a means to circumvent the registered-nurse requirement

imposed on all surveys by clause (g)(2)(E)(i). In doing so, the 2017 Final Rule mistakenly acts as if the initial Senate-passed version of House Bill 3545—which expressly limited its registered-nurse requirement to annual certification surveys— became law. It did not. The Conference Committee and Congress as a whole instead selected the House Ways and Means Committee's broader "[s]urveys under this subsection" language and included it in both the Medicare Act and the Medicaid Act.

Moreover, in the wake of the *Smith* litigation and the IoM Study, one of the core purposes of OBRA '87 was to *limit* the discretion of the Secretary and the States in order to ensure that residents of SNFs/NFs received high-quality care. The 2017 Final Rule flips that congressional intent on its head by suggesting that States have *carte blanche* to decide who can conduct a complaint survey. OBRA '87 gave States no such discretion, nor did OBRA '87 leave it to the discretion of the Secretary whether to require that all survey teams include at least one registered nurse. "Although administrative law has evolved to allow agencies significant leeway to fill in the interstices of broad congressional mandates, . . . control over the substance of the rules that govern the nation has always remained with Congress first. The Executive must comply with the duly enacted commands of Congress." *Alameda Cnty. Med. Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 4–5 (D.D.C. 2008). Such is the case here.

### B. Alternatively, the 2017 Final Rule Fails Under *Chevron* Step Two

Even if one assumes for the sake of argument that the 2017 Final Rule is not contrary to the plain meaning of OBRA '87, the Secretary's statutory interpretation

must still be reasonable. *See Chevron*, 467 U.S. at 843–44. In conducting such a reasonableness inquiry, a court "consider[s] whether the interpretation is arbitrary or capricious in substance, or manifestly contrary to the statute. . . . [The] focus is thus on whether the [agency] has reasonably explained how the permissible interpretation it chose is rationally related to the goals of the statute." *Good Fortune Shipping SA v. Comm'r*, 897 F.3d 256, 261 (D.C. Cir. 2018). As the Supreme Court has explained: "*Chevron* allows agencies to choose among competing reasonable interpretations of a statute; it does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not." *Michigan v. EPA*, 135 S. Ct. 2699, 2708 (2015). As outlined below, the 2017 Final Rule's interpretation of OBRA '87 constitutes an unreasonable interpretative gerrymander.

The Secretary claimed below that the statutory language "[s]urveys under this subsection" found in clause (g)(2)(E)(i) refers solely to surveys performed under paragraph (g)(2) and not complaint surveys performed under paragraph (g)(4) even though both paragraphs are found in subsection (g). *See* Mem. of Law in Supp. of Gov't Cross-Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. at 11–12, ECF No. 40. If that were correct, however, it would also mean that the conflict-of-interest limitations contained in clause (g)(2)(E)(ii)—which conflict-of-interest limitations apply to a "member of a survey team *under this subsection*" (emphasis added)—would *not* apply to surveyors conducting a complaint survey under paragraph (g)(4). In other words, under the Secretary's view of the statute, States would be free to use as

complaint surveyors individuals who own the very facilities under review or who are employed by those facilities. That clearly is not what Congress intended.

The Secretary's statutory interpretation would also lead to absurd results as it relates to States whose survey performance the Secretary must evaluate through the use of validation surveys under paragraph (g)(3). If the Secretary were correct that clause (g)(2)(E)(i)'s use of the words "[s]urveys under this subsection" refers solely to surveys performed under paragraph (g)(2), the Secretary would be free to conduct validation surveys using whomever he wants. Once again, that clearly is not what Congress intended.

The legislative history of OBRA '87 demonstrates that Congress had one over-arching purpose in enacting that groundbreaking statute: ensuring that residents of SNFs/NFs receive high-quality care. Congress addressed that goal in multiple ways, including by imposing stringent registered-nurse requirements on SNFs/NFs. *See* Social Security Act § 1819(b)(4)(C)(i), 42 U.S.C. § 1395i-3(b)(4)(C)(i) (explaining that a SNF "must provide 24-hour licensed nursing service which is sufficient to meet nursing needs of its residents and must use the services of a registered professional nurse at least 8 consecutive hours a day, 7 days a week"); Social Security Act § 1919(b)(4)(C)(i), 42 U.S.C. § 1396r(b)(4)(C)(i) (imposing similar requirement on NFs). Congress rationally imposed a corollary requirement on the Secretary and the States by requiring that all survey teams include at least one registered nurse.

- 26 -

The Secretary may now question the wisdom of that policy decision in light of States' protestations that they lack sufficient staff and/or resources to comply with the registered-nurse requirement. *Cf.* Gov't Accountability Office, *Nursing Homes: More Reliable Data and Consistent Guidance Would Improve CMS Oversight of State Complaint Investigations*, Rep. No. GAO-11-280, at 21 (Apr. 2011) (noting States' staff-shortage concerns while criticizing CMS's oversight of the complaint process).[7] However, it is up to Congress and Congress alone to amend the statutory scheme put in place by OBRA '87. The 2017 Final Rule impermissibly weakens the survey process established by Congress to the detriment of residents of SNFs/NFs and the facilities that strive to provide residents with high-quality care.

---

[7] *Available at* https://www.gao.gov/assets/gao-11-280.pdf (last visited Feb. 21, 2020).

# CONCLUSION

For the foregoing reasons and those advanced by the Plaintiff-Facilities, the Court should reverse the judgment of the district court and vacate that portion of the 2017 Final Rule at issue here.

Dated: Washington, District of Columbia
      February 21, 2020

                            REED SMITH LLP

                    By:  s/James F. Segroves
                            James F. Segroves
                            1301 K Street, NW
                            Suite 1000 - East Tower
                            Washington, DC 20005-3373
                            (202) 414-9200
                            jsegroves@reedsmith.com

                            *Counsel for Amicus Curiae*
                            *American Health Care Association*

**CERTIFICATE OF COMPLIANCE**

On this twenty-first day of February, 2020, the undersigned certifies that:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(d) and Circuit Rule 29.1(c) because this brief contains 6,848 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Garamond font.


                                                                  s/James F. Segroves
                                                                  James F. Segroves

## CERTIFICATE OF SERVICE

The undersigned certifies that on this twenty-first day of February, 2020, he electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

    s/James F. Segroves
    James F. Segroves